900 P.2d 182

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Charles W. QUESNEL, III,
Defendant–Appellant.**

**No. 17046.**

Intermediate Court of Appeals of Hawai'i.

July 25, 1995.

186

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellant.

Robert K. Kekuna, Jr., Deputy Pros. Atty., County of Maui, on the brief, Wailuku, for plaintiff-appellee.

·Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

On July 22, 1992, Defendant–Appellant Charles W. Quesnel, III (Defendant) was charged in Criminal Case No. 92–0374(1) with one count of promoting a dangerous drug in the first degree in violation of Hawai'i Revised Statutes (HRS) § 712–1241(1)(a) (Supp.1992),[1] and one count of prohibited acts related to drug paraphernalia in violation of HRS § 329–43.5(a) (Supp.1992).[2]

All of the items which are the subject matter of the counts were seized on July 15, 1992, pursuant to a search warrant.

On October 21, 1992, Defendant filed a Notice of Joinder in Motion to Suppress Evidence filed by co-defendant Melissa Quesnel, his wife (Co-defendant). Maintaining that the manner in which the police executed the search warrant at his home, violated statutory and constitutional law, Defendant sought to suppress all contraband seized in the July 15, 1992 search. On December 28, 1992, the court filed its Decision and Order Denying Defendants' Motion to Suppress Evidence which included the court's findings of fact and conclusions of law.

On January 22, 1993, Defendant was adjudicated guilty after a stipulated-facts bench trial. Pursuant to a March 25, 1994 judgment of conviction, he was sentenced to indeterminate prison terms of twenty years on the first count and five years on the second count. Defendant was additionally sentenced to prison terms on his pleas of no contest to charges filed in Criminal Case No. 92–0404.[3] The evidence used in Criminal Case No. 92–0404 had been seized on June 30, 1992, in the execution of a prior search warrant on the same premises. All terms were ordered to run concurrently.

Defendant appeals his convictions in Criminal Case No. 92–0374(1) and the order denying his motion to suppress evidence obtained in the July 15, 1992 search. He asserts the

---

**1.** Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i) (Supp.1992) states:

(1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
(a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
(i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

**2.** HRS § 329–43.5(a) (Supp.1992) provides:

It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

**3.** In Criminal Case No. 92–0404, the parties stipulated to the following: On June 30, 1992, Maui police officer David Lake, along with other police officers, executed a search warrant on the home of Defendant and Co-defendant at 1010 Alaea Street in Makawao. In the search, police retrieved black tar heroin, marijuana, and drug paraphernalia from the premises.

Defendant was charged with one count of promoting a dangerous drug in the third degree; one count of prohibited acts related to drug paraphernalia; and one count of promoting a detrimental drug in the third degree. Defendant pleaded no contest to these charges on January 22, 1993. These charges are not the subject of appeal.

following conclusions of law were erroneous: First, the "[e]xecution of this search warrant was reasonable"; and, second, the prior recovery of contraband at Defendant's residence was an exigency justifying the entry in this case.

We agree and reverse the March 25, 1993 judgment of conviction and, as it applies to Defendant, the December 28, 1992 Decision and Order Denying Defendants' Motion to Suppress.

I.

In *State v. Garcia*, 77 Hawai'i 461, 887 P.2d 671 (App.1995), we held HRS § 803–37 (1985) requires the police to specifically demand entry in addition to declaring their office and business in executing a search warrant, and that under the Hawai'i Constitution, the police must afford occupants of the premises a reasonable time to respond, unless exigent circumstances justify immediate entry. This appeal presents a *Garcia*-related question of whether the recovery of contraband in the execution of a prior search warrant constitutes an exigent circumstance, justifying a near-immediate entry in the execution of a subsequent search warrant on the same premises.

We review the evidence disclosed at the suppression hearing. On June 30, 1992, a search warrant had been executed at Defendant's and Co-defendant's residence, 1010 Alaea Street in Makawao, on the island of Maui, and "black tar heroin, marijuana and [drug] paraphernalia" were recovered. Maui police officer David Lake (Officer Lake) had taken part in this search. No weapons were discovered in the home, and although Officer Lake had no opportunity to observe Defendant, he did not see Co-defendant attempt to destroy any evidence.

On July 15, 1992, at approximately 6:45 p.m., Officer Lake and eight other police officers returned to Defendant's and Co-defendant's home with a second search warrant. Officer Lake testified that Officer George Kronoski (Officer Kronoski) "pounded" on the door, yelled, " 'Police. Search warrant[,]' " and when no one answered, kicked in the door, allowing the officers to enter. While asked about the "time frame" for the procedure, Officer Lake instead appeared to indicate that the police made their announcement "five to 10 seconds after [Officer Kronoski] did his pounding on the door."

Q. [ (Prosecutor) ] Who was the first officer to approach the door?

A. [ (Officer Lake) ] That was Officer George Kronoski.

Q. Were you able to see Officer Kronoski as he approached the door?

A. Yes.

Q. What did he do when he got to the front door?

A. When he got to the front door, he pounded on the door, and then he yelled out, "Police. Search warrant."

Q. Did anyone answer the door?

A. No.

Q. What action was taken when no one answered the door?

A. George Kronoski then kicked the door open, and then we entered.

Q. What was the time frame between the time that Officer Kronoski first knocked on the door, announced police with a search warrant, and then kicked the door in?

A. I would say within five to 10 seconds after he did his pounding on the door, then he called out, "Police. Search warrant." He and Officer Kaupalolo was [sic] at the door, and I noticed that they were trying to time their kicks. So they were counting 1, 2, 3, and then they kicked.

On cross-examination, Officer Lake, in a somewhat different account, reported that Officer Kronoski "pounded" three times on the door, yelled "police, search warrant[,]" counted "1, 2, 3[,]" and then with Officer Kaupalolo, "kicked in the door[.]" Timing the sequence of these events, the court noted that the entire process took ten seconds:

Q. When Officer Kronoski pounded on the door, did he yell, police and search warrant, while he was pounding?

A. No, he pounded first, then he yelled out, police.

Q. How many times did he pound?

A. I would estimate three times.

Q. So is this about right? Boom, boom, boom. Police. Search warrant?

A. Yes.

Q. And then he and John Kaupalolo counted, 1, 2, 3, and then kicked in the door?

A. Yes.

Q. That's about how it happened.

A. Just about, yes.

Q. Okay. Did it take about that long?

A. Yeah, close to it.

. . . .

THE COURT: I'm glancing at the second hand on the clock while you were asking that question. Seems to me that it was 10 seconds.

The court, therefore, made the following finding: "The police officers, upon execution of the search warrant, knocked three times, announced 'police, search warrant, open up,' then counted 'one, two, three,' and then kicked the Quesnel's [sic] front door in, and entered. *The entire process required approximately ten seconds.*" (Emphasis added.) The State did not object to this finding at the hearing, nor does it dispute it on appeal.

When asked why the police had not waited for someone to respond, Officer Lake explained that because a search warrant had been previously executed at the residence, "there was a high probability that evidence, may be destroyed if [the officers] did not enter immediately":

Q. [ (Prosecutor) ] And so why did you use force to enter the house this time on July 15th rather than wait for someone to answer the door?

A. [ (Officer Lake) ] Well, due to the search warrant that was done two weeks earlier, there was a high probability that

evidence may be destroyed if we did not enter immediately.

According to Officer Lake, they found Co-defendant in the living room, facing the door, and standing next to a tray containing marijuana and drug paraphernalia. Co-defendant testified that when the police broke through, she was standing approximately thirty feet away from the door and she did not hear anyone pounding on the door or yelling, "Police. Search warrant."

In their search of the house, the police recovered $2,300 in cash, marijuana, black tar heroin, and miscellaneous drug paraphernalia. The police arrested Co-defendant. Defendant arrived on the premises five minutes after the warrant was executed and was also arrested.[4]

## II.

■ We note, at the outset, that the court's Finding of Fact No. 2, was that the officers "announced[,] 'police, search warrant, *open up* [.]' " (Emphasis added.) However, none of the appellate briefs indicate that the police demanded entry by commanding, "open up[.]" Our review of the transcript does not furnish any evidence that the officers demanded entrance as expressly directed by HRS § 803–37 (1985).[5] We are constrained to hold that there is no evidence in the record to support this finding of fact, and thus, it is clearly erroneous. *State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (a finding of fact is clearly erroneous when the record lacks any evidence to support the finding).

■ Based upon the express language of HRS § 803–37, and supported by common law and a related statute, we have held that "before attempting forcible entry, the police

---

4. An additional $335 in cash was recovered from Defendant's right front pocket, bringing the total cash recovered by the police to $2,635.

5. HRS § 803–37 states:

§ **803–37 Power of officer serving.** The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission if the officer finds it open. If the doors are shut the officer must declare the officer's office and the officer's

business, *and demand entrance.* If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them. When entered, the officer may demand that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and if refused the officer may break them.

(Emphasis added.)

must specifically 'demand entrance[ ]' " and "that the demand [must] be orally communicated in the same way the police announce their office and purpose." *State v. Garcia*, 77 Hawai'i 461, 466, 887 P.2d 671, 676 (App. 1995). An entry made in violation of this requirement is illegal and the fruits of the resulting search are subject to suppression. *Id. See State v. Abordo*, 61 Haw. 117, 120, 596 P.2d 773, 775 (1979) (evidence obtained through an unlawful search and seizure will be excluded from trial). The failure to raise this issue on appeal is plain error of which we may take notice. Hawai'i Rules of Penal Procedure Rule 52(b). We hold that because the police made entry without the requisite demand, the contraband was obtained in violation of HRS § 803–37 and, thus, should have been suppressed by the court.

### III.

In the alternative, we believe it necessary to examine the court's conclusion that the police did not violate HRS § 803–37, because that statute permits the officers to break into the premises if the "bars to the entrance are not *immediately* opened[.]" (Emphasis in trial court's Conclusion of Law No. 1.) This conclusion, however, would not be determinative of whether the occupants of the premises were afforded a reasonable time to respond.[6]

As we noted, the court found that "approximately ten seconds" elapsed during the period when the police knocked at the door, made their announcement, kicked in the front door and entered the premises.[7] By contrast, Officer Lake had initially testified

that between five to ten seconds elapsed from the knock to the announcement of "police" and "search warrant." Considering so much of his version as may be reconciled with the court's ten-second finding,[8] somewhere between five to zero seconds elapsed from the announcement of office to the forced entry. On the other hand, Defendant claims there was in fact only a "three second interval ... between announcement and forced entry into the Quesnel residence[,]" referring to the period when Officers Kronoski and Kaupalolo counted "1, 2, 3" after making their announcement but before kicking in the door. The State does not specify how much time, based on the record, it believes elapsed between announcement and forced entry, but states that the police officers "wait[ed] an appreciable and prudent amount of time after announcing their office and business before forcibly entering the residence." The facts suggest, however, that the interval during which the police counted "1, 2, 3" after announcing their office and business was not so much to allow the occupants time to open the door as it was to allow the police time to synchronize their kicks in order to gain entry.

We do not believe that a reasonable amount of time passed to permit a response under either version. In *State v. Garcia*, 77 Hawai'i 461, 468, 887 P.2d 671, 678 (App. 1995), we held that in the absence of exigent circumstances, the officers must afford the occupants of the premises "a reasonable time" to respond to their announcement before making a forced entry. Otherwise, the "request for entry [is] meaningless." *Id.*

---

6. The court found that the ten-second period literally satisfied the statute, but correctly expressed concerns about the constitutionality of HRS § 803–37. The court stated,

   [The] Hawaii [Hawai'i] statute says, I quote, if the doors, gates, or other bars to the entries are not immediately opened. That's pretty strong language, immediately opened. That does not say that you have to have enough time to get over to the door and unlock it or open it. That says immediate.

   So on the statutory ground, five to [ten] seconds, appears to me, on the face, to be in compliance with the requirement.... I'm concerned about the constitutional test.

   On November 18, 1992, the court heard arguments on the constitutionality issue and queried,

"What's wrong with giving the occupant an opportunity to walk to the door and open it?"

7. In its oral decision, the court detailed the sequence of events:

   [T]he officers approached the door and then pounded on it three times and then said, police. Search warrant, or search warrant. Police—one or the other. I'm not sure that's material—and opened up. They then waited this count of three or so, and then kicked the door with the total lapse[d] time from the beginning of the knock to the entry to be approximately [ten] seconds.

8. The resolution of what may be conflicting testimony or evidence is for the factfinder, here, the trial court, to determine.

The point from which the occupants would know it was the police demanding entrance, as opposed to other persons, would be from the time the police announced their office and business. While "a reasonable period of time to respond ... must be determined by the circumstances of each case," *id.*, we hold that, generally, three to five seconds would not afford the occupants "a reasonable time to respond." If the occupants are not afforded a reasonable time to respond, the entry and the ensuing search and seizure are illegal and the evidence seized must be suppressed. *Id.* at 466, 887 P.2d at 676.

■ In its answering brief, the State emphasized that the officer "*may* have waited up to ten seconds" after knocking and before announcing his office and business. (Emphasis added.) Assuming *arguendo* this was correct, knocking alone would not inform the occupants that it was the police demanding entrance. Knocking fails to identify the party seeking a response and the failure to reply immediately should not impute to the occupants an intention to avoid a lawful order. " 'The purpose of the knock-and-announce rule [after all] is to notify the person inside of the presence of [the] police and of the impending intrusion, give that person time to respond, avoid violence, and protect privacy as much as possible.' " *Garcia*, 77 Hawai'i at 468, 887 P.2d at 678 (quoting *People v. Condon*, 148 Ill.2d 96, 103, 170 Ill.Dec. 271, 274, 592 N.E.2d 951, 954 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1359, 122 L.Ed.2d 738 (1993)) (internal quotation omitted). Such considerations are triggered when the police, by identifying themselves, their business, and demanding entrance, notify the occupants of their pending official intrusion. Knocking, itself, would not notify the occupants "of the presence of [the] police."

Finally, we are not left with any doubt that the entry was plainly unreasonable because Officer Lake, himself, characterized the police entry as "immediate." As he pointed out, "due to the search warrant that was done two weeks earlier, there was a high probability that evidence may [sic] be destroyed *if [they] did not enter immediately.*" (Emphasis added.)

## IV.

The foregoing statement was the basis for the court's Finding of Fact No. 4 that the officers "reasonably believed that there was a high probability that evidence would be destroyed if entry was delayed" and related Conclusion of Law No. 4 that "[a]t least some exigency exists when there has been a prior recovery of contraband at the residence searched."

### A.

■ We must hold that Finding of Fact No. 4 was not supported by any evidence. It appears that the sole basis for this finding was Officer Lake's previously quoted statement. There were no facts adduced, however, to support the Officer's belief.

■ The State has the responsibility of establishing the existence of the exigency from the totality of the circumstances. *State v. Clark*, 65 Haw. 488, 494, 654 P.2d 355, 360 (1982). "[I]n seeking to meet this burden, '[t]he police must be able to point to specific and articulable facts from which it may be determined that the action they took was necessitated by the exigencies of the situation.' " *Id.* (quoting *State v. Dias*, 62 Haw. 52, 57, 609 P.2d 637, 640–41 (1980)). "The exigent circumstances the State needs to show to justify a forced entry, when the presence of drugs is suspected, are that 'the occupants ... are aware of the police presence and are taking steps which the police realistically fear may lead to destruction [or removal] of the contraband.' " *Id.* (quoting *State v. Davenport*, 55 Haw. 90, 99, 516 P.2d 65, 72 (1973)).

The State did not submit any evidence that the police, after knocking and announcing, heard frantic movement or flushing toilets or other signals that the occupants were attempting to destroy or hide evidence. *See State v. Garcia*, 77 Hawai'i 461, 470, 887 P.2d 671, 680 (App.1995). As the Hawai'i Supreme Court pointed out previously, " '[t]hat contraband is easily removed, hidden, or destroyed is not, in and of itself, an exigent circumstance.' " *Id.* (quoting *State v. Dorson*, 62 Haw. 377, 385, 615 P.2d 740, 746 (1980)). Here, there were no specific facts

giving rise to a reasonable belief, of the probability, much less the "high probability[,]" that the occupants would remove or destroy contraband.

## B.

■ We are left, then, with the ruling of the trial court, that as a matter of law, the recovery of contraband at the residence, through a prior search warrant is an exigent circumstance [9] justifying immediate forcible entry in the execution of a second and subsequent search warrant.

■ Assuming the relevance of the first search warrant, we discern nothing in its execution on June 30, 1992, which would give rise to a reasonable, realistic belief that any person on the premises would attempt to dispose of or destroy contraband upon the execution of a subsequent search warrant. There was no evidence that the defendants failed to reasonably respond to the execution of the first search warrant. There were no exigent circumstances warranting immediate or near-immediate entry by the police. No weapons were found after entry, and the defendants did not attempt to dispose of or to destroy any contraband in the June 30, 1992 search.

We said that our holding in *Garcia* did "not prevent police executing a warrant from immediately entering the [subject] premises if exigent circumstances justify such an en-try." *Garcia*, 77 Hawai'i at 469, 887 P.2d at 679.

We recognize that this case presented the trial court with an issue of first impression in our jurisdiction but we are reluctant to adopt a rule which would allow police, when armed with a search warrant, to make immediate entry, especially forcible entry, without regard to the then-appurtenant circumstances simply because contraband had been obtained from the premises under a prior search warrant.[10] Aside from our announced constitutional respect for the privacy of the home and the dignity of our citizens, we would, by adopting such a rule, be inviting the evils sought to be avoided by "knock-and-announce" statutes and rules: the risk of unwarranted intrusion into homes and the privacy of our citizens and the risk of injury and violence to the searching officers and the occupants of the premises. We cannot lose sight of the fact that each subsequent entry would constitute a new intrusion pregnant with the same considerations as the first entry. Certainly, the sole fact that contraband was discovered in a prior warrant search would not presciently establish that in the execution of a subsequent search warrant, contraband, if present, would be disposed of or destroyed. The vagaries of each situation underscore the necessity of applying an exigent circumstances rule which focuses on the exigencies arising on the occa-

9. By definition, an event which had taken place two weeks prior could not be an "exigent" circumstance attendant to the July 12, 1992 search. "Exigence" is defined as "[s]omething arising suddenly *out of the current state of events;* any event or occasional combination of circumstances, calling for immediate action or remedy[.]" *Black's Law Dictionary* 573 (6th ed. 1990) (emphasis added). Our supreme court has observed that, generally, "exigent circumstances ... exist when the demands *of the occasion* reasonably call for an immediate police response." *State v. Clark*, 65 Haw. 488, 494, 654 P.2d 355, 360 (1982) (citations and internal quotations omitted) (emphasis added). "More specifically, it includes situations presenting an immediate danger to life or of serious injury or an immediate threatened removal or destruction of evidence." *Id.*

10. The trial court acknowledged that "[t]here apparently are no exigent circumstances here, other than the fact that the defendant [sic] had

executed a warrant approximately 15 days earlier and found contraband on the premises." While making its ruling on the motion to suppress, the trial court was appropriately chary about recognizing an "exigency" under these circumstances:

> [I]t seems to be settled as a matter of constitutional law that exigent circumstances will justify an immediate entry, even a lack of announcement. The question is whether we have any exigency here.
>
> And the Court would conclude that while there is some—it's mild exigency I grant you.... So I find some exigency ... although, as the defendants have pointed out, there is no evidence of any attempt to destroy evidence back at the time of June 30th....
>
> I consider the case being one that's really on the cusp of reasonableness.... [T]here seems to be no general rule and the cases all turn on that particular fact, and this Court has to make a decision....

sion of the search being considered, if we are to adhere to the premise that the execution of every search warrant must be reasonable because of our constitutional guarantees against unreasonable searches, seizures, and invasions of privacy. We hold, accordingly, that the recovery of contraband in the execution of a prior search warrant is not an exigency of, and does not justify an immediate forcible entry in, the execution of a subsequent search warrant for the same premises. We do not reach the question of whether the recovery of contraband in the execution of a prior search warrant when combined with other circumstances would justify an immediate entry into the premises.

## V.

Because Defendant's conviction was based solely on the evidence recovered in the illegal search of July 15, 1992, the March 25, 1993 Judgment and, as to Defendant, the December 28, 1992 Decision and Order Denying Defendants' Motion to Suppress Evidence are reversed.